```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF NEW YORK

 3  _____

 4  MICHAEL MCCALLION,

 5          Plaintiff,

 6      v.                              Case No:

 7  C.O. MATTHEW MARRA,              22-CV-00253

 8  SGT. JOSEPH COFFEY,

 9  C.O. MARCUS HART,

10  C.O. SHAWN BARBARITO,

11  C.O. GORDON GRIFFITH,

12  C.O. WEIDNER, and

13  C.O. KREG JACKSON,

14          Defendants.

15  _____

16                    DEPOSITION

17  _____

18

19  WITNESS:          Matthew Marra

20  DATE:             Friday, March 24th, 2023

21  START TIME:       11:02 a.m.

22  END TIME:         12:41 p.m.

23  REMOTE LOCATION:  Webex platform

24  REPORTER:         Kimberly Costanza, CER-

25  JOB NO.:          15856
```

```
 1                    A P P E A R A N C E S

 2

 3         SIVIN, MILLER & ROCHE, LLP

 4         20 Vesey Street

 5         Suite 1400

 6         New York, New York 10007

 7         By:  EDWARD SIVIN, ESQUIRE

 8              esivin@sivinandmiller.com

 9         Appearing for Plaintiff

10

11         NICHOLAS DORANDO

12         New York State Office of the Attorney General

13         The Capitola

14         Albany, New York 12224

15         By:  NICHOLAS DORANDO, ESQUIRE

16              Nicholas.Dorando@ag.ny.gov

17         Appearing for Defendants

18

19

20

21

22

23

24

25
```

1              I N D E X   O F   T E S T I M O N Y

2

3    EXAMINATION OF MATTHEW MARRA:                        PAGE

4         By Mr. Sivin                                     9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              I N D E X   O F   E X H I B I T S

2                  (available for download)

3    EXHIBIT    DESCRIPTION                          PAGE

4    1          Misbehavior Report                    62

5    2          Use of Force Report                   63

6    3          To From Memorandum                    64

7    4          Employee Injury Report                65

8    5          Photos of Plaintiff                   67

9    6          Report of Interview                   70

10   7          Logbook                               72

11   8          OSI Notification                      74

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                          FEDERAL STIPULATIONS
3
4              IT IS HEREBY STIPULATED AND AGREED by and
5    between the attorneys for the respective parties that
6    the presence of the Referee be waived;
7              IT IS FURTHER STIPULATED AND AGREED that all
8    objections, except as to form, are reserved until the
9    time of trial;
10             IT IS FURTHER STIPULATED AND AGREED that this
11   deposition may be utilized for all purposes as provided
12   by the Federal Rules of Civil Procedure;
13             AND FURTHER STIPULATED AND AGREED that all
14   rights provided to all parties by the Federal Rules of
15   Civil Procedure shall not be deemed waived and the
16   appropriate sections of the Federal Rules of Civil
17   Procedure shall be controlling with respect thereto.
18
19
20
21
22
23
24
25
```

```
 1              FEDERAL REMOTE STIPULATIONS

 2

 3              IT IS HEREBY STIPULATED, by and between the

 4    attorneys of record for all parties to the above-

 5    entitled action, that:

 6              Pursuant to Rule 30(b)(4) of the Federal Rules

 7    of Civil Procedure, this deposition will be conducted by

 8    remote videoconference with the oath being administered

 9    remotely and a court reporter creating an accurate

10    written record; that, if necessary, the parties agree

11    that each witness can be identified with picture

12    identification;

13              No attorney, nor any party or witness, shall

14    capture any still photographs, nor record, by video or

15    audio, any part of these deposition proceedings;

16              Each attorney agrees to instruct their witness

17    that there is to be no communication with anyone outside

18    of the identified and participating group, by chat,

19    text, email, or other means during the deposition;

20              There shall be no other person in the room

21    with the witness during their deposition;

22              Any phone or electronic device in the room

23    with a witness shall be identified and not read,

24    referred to, or otherwise used during the witness'

25    deposition, unless agreed to by all counsel on record.
```

```
1                    P R O C E E D I N G S
2                    THE REPORTER:  Okay.  We are now on the
3    record.  Today's date is March 24th, 2023, and the time
4    is approximately 11:02 a.m. Eastern Standard Time.
5                    My name is Kimberly Costanza, and I'm the
6    officer designated by Remote Legal, 381 Park Avenue
7    South, New York, New York, to take the record of this
8    proceeding.
9                    This is the deposition of Matthew -- I'm
10   sorry -- Matthew Marra, taken in the matter of McCallion
11   versus Matthew Marra, et al., Case Number 22-CV-00253,
12   filed in the United States District Court, Northern
13   District of New York.
14                   This deposition is being taken remotely
15   on behalf of the plaintiff and is being conducted
16   pursuant to the procedural rules and laws governing this
17   matter.  As such, all parties agree to this means of
18   capturing the record, which may include recording by
19   audio, audiovisual, or stenographic means, as if it were
20   done by traditional in-person means.
21                   Further, all parties agree that the
22   deposition officer or person administering the oath may
23   be authorized to administer the oath under the rules of
24   the state where they reside.
25                   Do all parties so stipulate?
```

```
 1                    MR. SIVIN:  Plaintiff stipulates.

 2                    MR. DORANDO:  I stipulate on behalf of my

 3   client.

 4                    THE REPORTER:  Thank you.  And would all

 5   counsel please identify themselves for the record,

 6   starting with the noticing.

 7                    MR. SIVIN:  Edward Sivin for the

 8   plaintiff.

 9                    MR. DORANDO:  Nicholas Dorando for the

10   Office of the Attorney General for the defendant.

11                    THE REPORTER:  Thank you.  And I will now

12   --

13                    MR. MARRA:  This is CO M. Marra --

14                    THE REPORTER:  Yes.

15        MR. MARRA:  -- Department of Corrections.

16                    THE REPORTER:  Thank you.  I will now

17   swear in the witness.

18                    Will the witness please state and spell

19   your name for the record.

20        MR. MARRA:  Oh.  CO M. Marra.

21                    THE REPORTER:  Thank you.  Will you

22   please spell your last name for the record.

23                    MR. MARRA:  M-A-R-R-A.

24                    THE REPORTER:  Thank you.  And will you

25   please raise your right hand.
```

1            Do you swear or affirm that the testimony

2    you shall give today in this proceeding will be the

3    truth, the whole truth, and nothing but the truth?

4            MR. MARRA:  I do.

5    WHEREUPON,

6            M A T T H E W   M A R R A

7    having been called as a witness, being duly sworn by the

8    notary public present, testified as follows:

9            THE REPORTER:  Thank you.  Counsel, you

10   may begin.

11           MR. SIVIN:  Thank you.

12           Good morning, Officer.

13           THE WITNESS:  Good morning.

14                EXAMINATION

15   BY MR. SIVIN:

16      Q    My name is Edward Sivin.  I represent the

17   plaintiff, Michael McCallion.  I'm going to be asking

18   you some questions relating to an incident -- an initial

19   incident that occurred on October 28th of 2020 at

20   Gouverneur Correctional Facility.  If for any reason,

21   Your Honor understand my question, or a question is not

22   clear to you, don't answer the question, and instead ask

23   me to repeat it or rephrase it, and I will do so, okay?

24      A    Okay.

25      Q    Also, please make sure that all of your

1    responses are verbal, because the stenographer can't

2    take down hand gestures or head gestures, okay?

3         A    Okay.

4         Q    And my final request is, please wait until I

5    completely finish my question before you begin your

6    answer, even if you know what I'm about to ask, because

7    this stenographer can't take down both of us speaking at

8    the same time, okay?

9         A    Okay.

10        Q    All right.  Are you currently a correction

11   officer with the Department of Corrections and Community

12   Supervision?

13        A    Yes.

14        Q    When did you graduate the academy?

15        A    I grad -- I went into the academy January

16   25th, 2016.

17        Q    And when did you graduate?

18        A    The academy is eight weeks long, so I don't

19   have an exact date for you.

20        Q    Okay.  I'd like you to take me through your

21   assignments from when you graduated the academy to the

22   present and give me the general time frames.

23        A    Do you want the jails that I was --

24        Q    Yes.

25        A    Okay.  So after the academy, I was placed in

1    Washington Correctional Facility for approximately two

2    months.  Then I went to Five Points Correctional

3    Facility for about six months.  And then I went to

4    Albion Correctional Facility for about a year and a

5    half, and then I transferred to Gouverneur Correctional.

6         Q    When did you first start at Gouverneur?

7         A    About three years -- or four years ago.

8         Q    Your first name is Michael?

9         A    Matt -- no, it's Matthew.

10        Q    I'm sorry.  Matthew.  And do you have a middle

11   name?

12        A    Philip (phonetic).

13        Q    How tall are you?

14        A    About five-two.

15        Q    And back in October of 2020, approximately how

16   much did you weigh?

17        A    About 130 pounds.

18        Q    Now were you working at Gouverneur on October

19   28th, 2020?

20        A    Yes.

21        Q    Did you have a regular bid at that time?

22        A    I did.  I --

23        Q    What was --

24        A    Go ahead.

25        Q    What was your regular bid?

```
 1        A    I was on C1 dorm.

 2        Q    What were your duties at C1 dorm?

 3        A    I was the dorm officer on --

 4        Q    What is a dorm officer?

 5        A    We -- we regulate how the dorms run.  When

 6   they go out to chow program, we let them out.  We do

 7   security rounds on the dorm, in the bathrooms to

 8   maintain safety and security within the dorm.

 9        Q    Did you have a regular shift or tour that you

10   worked?

11        A    Three to 11.Three.

12        Q    Is that 3 p.m. to 11 p.m.?

13        A    Sorry.  Yep, 3 p.m. to 11 p.m.

14        Q    How long had you been a dorm officer at C1

15   dorm as of October 28th, 2020?

16        A    I'd -- at least a year.  I'm not positive.

17        Q    Okay.  Was that your regular bid for that time

18   period?

19        A    No, I didn't get the bid when I first got to

20   Gouverneur.  I was -- I didn't -- I got the bid after I

21   was -- had been there for a period of time.

22        Q    So how long had you been a dorm officer at C1

23   dorm as of October 28th, 2020?

24        A    I don't recall.  I don't know if it was a

25   year.  It might have been longer.
```

1                     MR. SIVIN:  Okay.  Your video is very

2    fuzzy now.  Is there any way you could clear that up?

3    I'm having trouble seeing you guys.

4                     MR. DORANDO:  Is it the filter or just --

5                     MR. SIVIN:  There we go.  There we go.

6    Now you're good.

7         MR. DORANDO:  Okay.

8                     MR. SIVIN:  All right.  Thanks.

9    BY MR. SIVIN:

10        Q    Now on October 28th, 2020, was Michael

11   McCallion residing at the C1 dorm?

12        A    He was.

13        Q    Did you know him before that day?

14        A    No.

15        Q    Okay.  Do you have any recollection of him

16   prior to October 28th, 2020?

17        A    Not -- no.  He came into my dorm, I believe, a

18   short period before -- before the incident, obviously,

19   but that's it.

20        Q    When you say, "obviously," why do you say

21   that?

22        A    Because he -- well, now -- like, the day the

23   incident occurred, that wasn't his first day on the

24   dorm.

25        Q    Okay.  Can you approximate how long he was on

1    the dorm before October 28th, 2020?

2         A    I can't.  I don't recall when he got there.

3         Q    Yep.  Do you have any recollection of him,

4    though, prior to October 28th, 2020?

5         A    Other than him being on my dorm for a period

6    of time prior to the incident, no.

7         Q    Okay.  Had you ever spoken with him before

8    that date?

9         A    I don't believe so.

10        Q    Had you had any problems with him?

11        A    I don't recall, no.

12        Q    Had you observed Mr. McCallion have problems

13   with any other officers?

14        A    No.

15        Q    Did you ever know him to be violent or hear of

16   him being violent?

17        A    No.

18        BY MR. DORANDO:  Object to form.

19   BY MR. SIVIN:

20        Q    What was your shift on October 28th, 2020?

21        A    Three to 11.

22        Q    And did there come a time when you had some

23   type of an encounter with Mr. McCallion on October 28th,

24   2020?

25        A    I did.

1          Q     Where did that encounter first take place?

2          A     The inmate bathroom.

3          Q     Can you describe the inmate bathroom for me?

4    What did it look like?

5          A     It's a long, somewhat narrow room that has

6    stalls on one side and sinks on the other.

7    Approximately four stalls on one side, I believe, and

8    somewhere between six and eight, I think, sinks on the

9    other.

10         Q     Is it generally rectangular shaped?

11         A     Yeah, I would say so.

12         Q     Okay.  Any shower stalls in there?

13         A     The shower stalls are on the other side of the

14   bathroom.

15         Q     And what brought you to the bathroom just

16   prior to your encounter with Mr. McCallion?

17         A     So while making security rounds on the dorm, I

18   heard screaming, yelling, coming from the inmate

19   bathroom.  And that's when I entered the bathroom and

20   can see McCallion standing there.

21         Q     Where were you when you first heard the

22   screaming and yelling?

23         A     When I first heard it, I was in, actually, in

24   the dorm area.  I heard -- I heard the screaming, so I

25   continued my rounds, went into the inmate bathroom to

1  see what was going on, and that's where, again, I saw

2  him.

3       Q    Okay.  Where in the dorm precisely were you

4  when you heard that screaming?

5       A    In where the inmates -- their sleeping area.

6       Q    Okay.  How many entrances were there to the

7  bathroom?

8       A    One.

9       Q    Okay.  Can you approximate for me how far away

10  from the entrance you were when you first heard that --

11  what you characterized as screaming and yelling?

12      A    I don't -- 50 -- 20 to -- honestly, I don't --

13  I don't have an idea of how -- it was probably at least

14  20 feet.

15      Q    Okay.

16      A    To give you an exact measurement, I don't -- I

17  don't know exactly where I was (indiscernible) 11:14 in

18  --

19      Q    Okay.

20      A    proximity to the bathroom.

21      Q    And when you first heard that screaming and

22  yelling, were you able to see inside the bathroom at

23  that point?

24      A    When I first heard it?

25      Q    Yeah.

1      A    No.

2      Q    In other words, from that perspective, if you

3  would look towards the bathroom, could you see inside

4  the bathroom at that point?

5      A    From where I was, no.

6      Q    Okay.  So what did you do immediately after

7  hearing that screaming and yelling?  Did you immediately

8  go to the bathroom, or did you do something else?

9      A    No, I immediately went to the bathroom right

10  from -- to continue my round to see what was going on.

11      Q    Can you describe in more detail what you meant

12  by screaming and yelling?

13      A    So I went in -- when I entered the bathroom --

14      Q    No, no.  I'm sorry.  Before you went to the

15  bathroom, when you say you heard the screaming and

16  yelling --

17      A    Yep.

18      Q    -- can you describe more precisely what you

19  heard that you characterize as screaming and yelling?

20      A    Loud, norm --

21      Q    I'm sorry?

22      A    Do you want me to -- I guess I don't -- can

23  you rephrase your question?

24      Q    Okay.  Did you hear any words when you heard

25  what you characterized as screaming and yelling?

1        A     Well, it wasn't words.  It was just the act of

2    screaming.  No words were coming out.  It was --

3        Q     Okay.  And did the screaming and yelling

4    appear to be coming from one person, more than one

5    person?

6        A     Before I entered the bathroom, I could not

7    tell who was doing it.  That's why I made it my way to

8    the bathroom to see who was doing it and what was going

9    on.

10       Q     In other words, when you first heard this, you

11   didn't know if the screaming and yelling was coming from

12   one person or more than one person, correct?

13                MR. DORANDO:  Objection.  You may answer.

14        MR. SIVIN:  You can answer.

15        THE WITNESS:  I can answer?

16                MR. DORANDO:  You can answer?

17                THE WITNESS:  Yeah, I don't -- my job at

18   the time was to -- I heard screaming.  My job is to --

19   for the safety of the inmates, is to figure out what is

20   going on and to -- to clear up any problems that may be

21   occurring.

22   BY MR. SIVIN:

23        Q     But my question is:  At that point, you didn't

24   know if the screaming was coming from one person or more

25   than one person, correct?

1       A    No.  There's no way for me to tell that.

2       Q    Okay.  Now, did the screaming sound like

3   someone was in distress, someone was angry, someone was

4   screaming out of joy?  Any other way you can

5   characterize it?

6       A    Distress.

7       Q    Okay.  What about the screaming that you heard

8   made you conclude that it was a screaming of distress?

9       A    Someone -- I guess I don't know how to

10  characterize screaming in a distressful way.

11      Q    Well, for instance, if you're at a basketball

12  game and you're rooting for your team and they score a

13  three pointer, you know, at the buzzer, that may result

14  in you screaming.

15      A    Yeah, not distress.

16      Q    Can you distinguish that type of screaming

17  from the screaming you heard?

18      A    No, that wouldn't characterize under distress.

19          MR. DORANDO:  I apologize.  I misheard

20  the question.  Can you restate what the question was?

21          MR. SIVIN:  Okay.

22   BY MR. SIVIN:

23      Q    Were you able to distinguish that screaming

24  from a distress screaming, to a excited screaming, or

25  any other type of screaming?

```
 1         A    Yes, I answered distress.

 2         Q    Okay.  And how long did it take you to arrive

 3   at the bathroom after you heard the screaming?

 4         A    Within seconds.

 5         Q    Okay.  Was there anyone else in your immediate

 6   area when you heard the screaming?

 7         A    Other inmate -- other inmates were around.

 8         Q    And how, if at all, were they responding to

 9   this -- what you characterized as screaming?

10         A    They started to clear out of the bathroom.

11         Q    Okay.  So between the time that you heard the

12   screaming and the time you entered the bathroom, are you

13   indicating that other inmates exited the bathroom?

14         A    Yes, because I -- yes.

15         Q    Okay.  How many inmates did you observe exit

16   the bathroom after you heard the screaming?

17         A    I don't recall.

18         Q    Was it more than five or fewer than five?

19         A    I don't -- I don't recall.

20         Q    Okay.  Was it more than 10 or fewer than 10?

21         A    Probably fewer than 10.

22         Q    Okay.  Maybe somewhere between 5 and 10.

23         A    I would say just less than 10.

24         Q    Okay.  And what, if anything, did you observe

25   about these inmates who were exiting the bathroom after
```

1    you heard the screaming?

2        A    They -- my attention wasn't on them.  It was

3    on McCallion.

4        Q    Well, before you entered the bathroom, you

5    didn't see McCallion, correct?

6        A    No.

7        Q    So these inmates --

8        A    You're talking

9        Q    -- were coming in --

10       A    -- before I entered the bathroom?

11       Q    Yes.

12       A    Before I entered the bathroom, I just saw them

13   kind of walking out of -- kind of fast walking out of

14   the bathroom, looking behind them, in somewhat surprised

15   look, I guess.

16       Q    Were all of them walking in that manner,

17   looking back with that surprised look?

18       A    I don't recall.

19       Q    Now, the screaming that you say that you

20   heard, do you know whether that screaming came from any

21   of the inmates who you observed walking out of the

22   bathroom?

23       A    I guess, definitively, no, I could not say if

24   before I arrived --

25       Q    Okay.

1      A    -- there that --

2      Q    Did you question any of these inmates who were

3  walking out of the bathroom as to what was going on?

4      A    No.

5      Q    Okay.  Now did the screaming continue from the

6  time that you first heard it until the time you entered

7  the bathroom?

8      A    It did.

9      Q    Okay.  Tell me what happened when you arrived

10  at the bathroom.

11      A    So when I arrived at the bathroom, I could see

12  McCallion screaming.  I proceeded to clear out the

13  bathroom for the other inmates' safety, and so it was

14  just McCallion in the bathroom screaming.

15      Q    So when you entered the bathroom, there were

16  other individuals besides McCallion inside there?

17      A    There was a few left, probably, yes.

18      Q    Can you identify any of them?

19      A    No.

20      Q    Have you ever tried to identify any of them?

21      A    No.

22      Q    Okay.  Can you identify any of the inmates who

23  you observed exiting the bathroom?

24      A    No.

25      Q    All right.  So what's the first thing you did

1  after entering the bathroom?

2      A    The first thing I did was I asked McCallion if

3  he was all right for his safety because I could see that

4  he was in distress.  That was the first thing I did.

5      Q    Is that before you asked the other inmates to

6  leave the bathroom?

7      A    No.  I cleared out the inmates, and then I

8  addressed McCallion.

9      Q    All right.  Tell me how you cleared out the

10  inmates.

11      A    I told them to go on a count.  19:25

12      Q    And did they respond?

13      A    Yes.

14      Q    And how did they respond?

15      A    By going to their -- their beds within the

16  dorm.

17      Q    Did you have any other conversation with any

18  of them?

19      A    No, it's a very quick on the count.  That's

20  all I say.  And they know exactly where to go.

21      Q    Okay.  Now where in the bathroom was McCallion

22  when you first saw him?

23      A    The middle of the bathroom.

24      Q    And then what was located in that middle area?

25      A    To one side you have stalls, one side you have

1   sinks.

2       Q    Okay.  And where were the other inmates that

3   you observed when you first entered the bathroom?

4       A    I don't recall.

5       Q    Okay.  And what specifically did you observe

6   McCallion doing when you first saw him?

7       A    I observed him screaming, kind of acting

8   erratically, pacing.

9       Q    What was he screaming?

10      A    Again, he wasn't verbally saying anything --

11  or nothing that I could understand at least.

12      Q    Okay.  Can you recreate it for us now?

13              MR. DORANDO:  Objection.

14              MR. SIVIN:  You can answer.

15              MR. DORANDO:  Yeah, go ahead.

16              THE WITNESS:  It was aah, aah.

17              MR. SIVIN:  Okay.  Your screen just went

18  blank, so --

19  BY MR. SIVIN:

20      Q    All right.  So other than the aah, aah, can

21  you identify any other sounds?

22      A    What?

23      Q    Well, what more than that can you recall for

24  us?

25      A    It just was higher pitch.  You know, to avoid

1    security coming here, I don't think I really --

2        Q    Okay.  But without getting your voice louder,

3    other than the aah, can you stipulate any other sounds

4    that you heard from him?

5        A    Not that I know of.

6        Q    Okay.  And you say also that he was acting

7    erratically.  What did you see or hear that led you to

8    believe that he was acting erratically?

9        A    Well, pacing -- atypical behavior that you

10   don't normally see.

11       Q    Well -- okay.

12       A    Just pacing.  He was sweating quite a bit.  It

13   looked like he had glossy eyes.  He appeared to be under

14   the influence of an intoxicant of some -- at some point,

15   after I asked him if he was okay, I quickly -- after a

16   quick examination, could see that he may be under the

17   influence.

18       Q    Okay.  Where was he pacing?

19       A    In the middle of the bathroom.

20       Q    Back and forth, up and down, or can you be

21   more specific?

22       A    Back and forth.

23       Q    Okay.  So, like, kind of the width of the

24   bathroom?

25       A    The -- more the -- the length.

1      Q    Okay.  And you say he was sweating.  When did

2   you first observe him sweating?

3      A    When I first asked him if he was okay.

4      Q    Okay.  Other than pacing, and sweating, and

5   glassy eyes, and screaming, what other observations did

6   you make about him at that time?

7      A    That was pretty much it.

8      Q    Okay.  So what happened after you observed him

9   pacing and screaming?

10     A    Well, again, I asked him if he was okay.  And

11  then when he saw me, he proceeded to start walking

12  towards me and then lunged at me.

13     Q    Now did he respond verbally at all when you

14  asked him if he was okay?

15     A    No.

16     Q    How far away from him were you when you asked

17  him if he was okay?

18     A    Probably five feet or so.

19     Q    And then you say he walked towards you and

20  lunged at you?

21     A    Correct.

22     Q    Now when you say lunged, can you describe

23  physically what he did?

24     A    Leaning in my direction with his arms

25  extended.

```
1          Q     Arms extended in what manner?

2          A     Like he was going to give me a hug.

3          Q     Can you describe the pace at which he walked

4     towards you?

5          A     It was, like, a fast, I guess, walk.

6          Q     Okay.  And did that pace remain the same

7     between the time that you -- he first approached you and

8     the time that you first used any force against him?

9          A     Yes, the pace, I believe, stayed the same.

10         Q     Okay.  So he's walking towards you with his

11    hands out like he wants to give you a hug; is that what

12    you're saying?

13         A     No, I -- he started walking towards me and

14    then lunged at me.

15         Q     Okay.  So when he's first walking towards you,

16    does he have his hands extended?

17         A     No.  He walks towards me and then lunges at

18    me.

19         Q     And when you say, "lunge," by that do you mean

20    that's the point at which he extended his arms?

21         A     Yes.  The action, yes.

22         Q     Other than -- I'm sorry?

23         A     The action of lunging, yes.

24         Q     Other than extending his arms, is there

25    anything else he did that leads you to characterize his
```

1    actions as a lunge?

2        A    No, I do not believe so.

3        Q    Okay.  And when he extended his arms, it

4    appeared to you as though he wanted to give you a hug;

5    is that correct?

6        A    Well, he was leaning towards my direction.

7    And I have reason to believe that he was going to use

8    force against me.

9        Q    And upon what did you base your conclusion

10   that he was going to use force against you?

11       A    That he was lunging at me.

12       Q    Okay.  Instead of using the word lunge, I'd

13   like you to just describe for me physically -- you've

14   already said he's walking towards you.  His pace doesn't

15   change.

16       A    Mm-hmm.

17       Q    He's got his arms towards you in a manner that

18   you previously characterized as asking for a hug.  Tell

19   me what else, if anything, he did that led you to

20   believe he was trying to physically attack you.

21       A    He was just walking fast towards me and leaned

22   into my direction.

23       Q    Okay.  What happened next?

24       A    I used body holds to take him to the ground.

25       Q    Describe the body holds.

```
 1        A    It was a -- I guess, more of a hip toss I used
 2   to take him to the ground.
 3        Q    What's a hip toss?
 4        A    It's when you take his momentum.  That him
 5   coming at me, and I kind of use it against him, and I --
 6   I go over my one right hip or left hip, depending on how
 7   you do it, and take him to the floor.
 8        Q    Well, how did you do it on this particular
 9   occasion?
10        A    Without looking at the -- I don't recall which
11   way it was.
12        Q    All right.  You were about to say without
13   looking at the -- what --
14        A    The paperwork.  I think I have it in there.
15        Q    Okay.  Now this hip toss, had you ever
16   previously used that type of maneuver?
17        A    In my lifetime?
18        Q    Yes.
19        A    Yes.
20        Q    Is it something that you had been trained on?
21        A    Within the department?  I --
22        Q    Anywhere?
23        A    I wrestled, so --
24        Q    Okay.  So is this kind of a standard wrestling
25   move that you had learned?
```

```
 1         A    Yes.

 2         Q    And is it called a hip toss?

 3         A    Yep.

 4         Q    Okay.  And describe for me the mechanics of

 5    the hip toss, what you did with your arms, what you did

 6    with your legs and so forth.

 7         A    I mean, I grab him by the upper torso area,

 8    and lean my hip into him, and use my upper body to --

 9    again, use his momentum against mine and take him to the

10    ground.

11         Q    And did you, in fact, take him to the ground?

12         A    I did.

13         Q    Did he make contact with the ground?

14         A    He did.

15         Q    What part of his body made contact with the

16    ground?

17         A    I -- I don't recall.

18         Q    Well, in the normal hip toss that you would

19    use at wrestling, is there a usual position that the

20    individual would end up on the ground?

21         A    No.

22         Q    Okay.  So you don't know if he landed face up,

23    face down, on his side, something else?

24         A    Oh.  No, it can really go any way.  It can go

25    any which way.
```

1        Q    Okay.  Putting aside how it can go, do you

2    know whether he landed face up, face down, on his side,

3    or something else?

4        A    I know he landed face down.

5        Q    Okay.  So you observed him actually make

6    contact face down; is that correct?

7        A    I -- yes.

8        Q    Okay.  And what parts of his body did you

9    observe making contact with the ground when you brought

10   him to the ground?

11              MR. DORANDO:  Objection.  You can answer.

12       THE WITNESS:  I don't recall.

13   BY MR. SIVIN:

14       Q    Okay.  Now what happened to your body when you

15   brought him down?

16       A    I -- well, I -- I suffered an eye contusion

17   from the incident.

18       Q    And which eye?

19       A    I don't recall.

20       Q    Okay.  How did you suffer that eye contusion?

21       A    Somewhere in the midst of taking -- taking him

22   down.

23       Q    Well, do you recall your face making contact

24   with anything that resulted in that eye contusion?

25       A    I didn't, but obviously it did at some point.

1       Q    Okay.  But generally, what happened with your

2  entire body as --

3       A    I landed --

4       Q    -- brought him down to the ground?

5       A    I landed on top of him.

6       Q    Okay.  Now did your front land on top of his

7  back, or was there some other type of contact?

8       A    My side may have landed on his side.  Just --

9  it's -- when you do a hip toss, you typically land side

10  to side.  It's kind of how you'd --

11       Q    But do you have any recollection of what part

12  of your body made contact with what part of his body?

13       A    No, I don't.

14       Q    Now sitting here today, are you aware of the

15  fact that after this incident, he was diagnosed with

16  four broken ribs?

17       A    Yes, I found that out.

18       Q    Okay.  Do you believe those ribs got broken by

19  you bringing him down to the ground?

20       A    I would assume so, yes.

21       Q    Okay.  And describe for me the mechanism by

22  which you believe his four ribs got broken by you just

23  doing a hip toss.

24       A    From my body weight landing on his -- on his

25  side.

1      Q    So you recall your body weight landing on his

2   side?

3      A    Yes.

4      Q    And which side did it land on?

5      A    Again, I don't -- I don't recall --

6      Q    What portion of --

7      A    -- exactly how --

8      Q    -- your body landed on his side?

9      A    Without -- I don't recall which side.  And I

10   don't exactly have a proximity of whether it was here --

11   or upper torso, lower torso.

12     Q    Did your knee land in his ribs at all?

13     A    No.

14     Q    Did any portion of your body make blunt force

15   contact with his ribs?

16     A    No.

17          MR. DORANDO:  Object -- objection, but

18   the answer stays.

19          THE WITNESS:  No.

20   BY MR. SIVIN:

21     Q    For how long a period of time had you been a

22   wrestler?

23     A    High school.

24     Q    Varsity?

25     A    Yep.  Yes, sir.

1        Q    And can you estimate how many hip tosses

2   you've executed during the course of your entire

3   wrestling career?

4                MR. DORANDO:  Objection.  You can answer.

5                THE WITNESS:  I don't recall.

6   BY MR. SIVIN:

7        Q    Would you say it's been at least 100?

8        A    A hundred?

9        Q    Yeah, in all the matches, and practices, and

10  scrimmages you've had.

11       A    I guess, your four year, yes, you could say

12  that.

13       Q    Okay.  And during any of those hip tosses, did

14  any of the individuals who you tossed end up with broken

15  ribs?

16       A    I don't recall.

17       Q    So why do you believe that your hip toss was

18  the mechanism that resulted in those four broken ribs?

19       A    Because I was -- I had a use of force on the

20  inmate.

21       Q    But what about that particular use of force

22  makes you believe that that caused his four broken ribs,

23  as opposed to some other use of force that may have

24  happened after your encounter with him?

25       A    Because I landed on his rib area.

1        Q    Okay.  So you recall now that you landed on

2   his rib area?

3        A    Well, his -- yes, his side, where his ribs are

4   located, yes.

5        Q    Okay.  Now at some point after it was

6   determined that he had four broken ribs, you were

7   interviewed by OSI, correct?

8        A    Correct.

9        Q    And before being interviewed by OSI, did you

10  ever tell anybody that you landed on his ribs?

11             MR. DORANDO:  Objection.  You can answer

12  if you recall.

13             THE WITNESS:  I may have told my

14  supervisor in the -- my To From, but I don't recall if

15  that was actually a -- or if that's something I just

16  disclosed to the internal investigation.  I don't --

17  BY MR. SIVIN:

18       Q    Okay.  So what happened after you brought Mr.

19  McCallion to the ground?

20       A    I activated my PAS system.

21       Q    How did you do that?

22       A    I reached my radio, and there's a button I can

23  push, and I pushed it.

24       Q    And what happens when you push that button?

25       A    It sends an alarm to the arsenal.  And then

1    the arsenal relays to the response team within the

2    facility that there is a red dot, or an emergency, on a

3    particular location -- or at a particular location.

4        Q    Did you speak at all during this red dot?  Did

5    you communicate anything to anyone?

6        A    To another officer?

7        Q    No, no.  When you activated the red dot, that

8    alerts someone in the arsenal, correct?

9        A    Right.

10       Q    Did you also say anything over a radio?

11       A    No, I don't have to.

12       Q    Does the arsenal officer know where the red

13   dot is coming from?

14       A    Yes, they know exactly that it was C1 dorm.

15       Q    Okay.  So tell me what -- tell me the physical

16   interaction between you and Mr. McCallion after you

17   brought him down to the ground.

18       A    He continued to struggle.  He kind of was

19   flailing his arms, so I tried to get him under control

20   and keep him -- keep him secured to the floor until help

21   arrived.

22       Q    And when you say he continued to struggle,

23   describe the actions that you characterize as a

24   struggle.

25       A    Just flailing his arms around, behind, trying

1    to grab.  Just -- he was struggling to get out of the

2    situation he was in.

3         Q    Was he still face down at that point?

4         A    He was.

5         Q    And you're still on him at that point?

6         A    Yes.

7         Q    Was he eventually placed in handcuffs?

8         A    He was.

9         Q    Were those your handcuffs?

10        A    No.

11        Q    Who placed him in handcuffs?

12        A    I did.

13        Q    Okay.  How did you get the handcuffs?

14        A    An officer responding saw that I was on top of

15   Inmate McCallion, and I got his arms behind his back,

16   and that's when I applied the mechanical restraints.

17        Q    Okay.  How much time elapsed between the

18   moment you brought him to the ground and the time you

19   put on the cuffs?

20        A    I don't recall an exact time frame.

21        Q    Give me a ballpark.

22        A    Twenty seconds -- 15 seconds, maybe.

23        Q    And during those 15 -- approximate 15 to 20

24   seconds, were you still on top of him?

25        A    Yes, I was continuing to struggle with him,

1    yes.

2        Q    Okay.  And by struggling, you mean trying to

3    get his arms behind his back?

4        A    Yes.

5        Q    Was he saying anything during this time?

6        A    He's continuing to scream.

7        Q    Any words that you recall?

8        A    No. Not (indiscernible - simultaneous speech).

9    40:09

10       Q    Was the screaming -- was the screaming the

11   same as you heard before, the aah?

12       A    Yes.

13       Q    Any different?

14       A    The same high-pitch screaming distress, no.

15       Q    Okay.  And who were the officers who

16   responded?

17       A    I can tell you Officer Hart was the one that

18   handed me the mechanical restraints.

19       Q    Would that be Marcus Hart?

20       A    I believe that's his first name.

21       Q    Anyone else respond?

22       A    Yes, more people did.

23       Q    Okay.  Can you identify any of them?

24       A    No, not -- I knew my --

25       Q    Did (indiscernible -- simultaneous speech.)

```
 1   41:03

 2        A    I knew my supervisor responded.

 3        Q    Who is your supervisor?

 4        A    Joe Coffey.

 5        Q    C-O-F-F-E-Y, correct?

 6        A    I believe so, yes.

 7        Q    Did Officer Barbarito respond?

 8        A    Based on looking at the reports, yes.

 9        Q    How about Officer Griffith?

10        A    I don't recall.

11        Q    Okay.  Can you identify any other officers who

12   responded?

13        A    No.

14        Q    Did anyone use force against Mr. McCallion in

15   the bathroom other than you?

16             MR. DORANDO:  Object to form. Go ahead.

17             THE WITNESS:  No.

18   BY MR. SIVIN:

19        Q    So after you got him in handcuffs, did he stop

20   struggling?

21        A    He did.

22        Q    What happened then?

23        A    We stood him up, and he was escorted out of C1

24   dorm.

25        Q    Now did you say, "we stood him up"?
```

```
 1        A    Me and someone else did, yes.

 2        Q    Do you know who that someone else is?

 3        A    I don't.

 4        Q    And how did you physically stand him up?

 5        A    I honestly -- I don't recall.  We -- it was a

 6   struggle.  I remember that.

 7        Q    So he struggled while you were standing him

 8   up?

 9        A    In the sense that he was on an intoxicant, I

10   don't think -- it wasn't a struggle, like, he was -- I

11   think he just didn't have balance at that point.  I

12   don't --

13        Q    Well, do you recall him not having balance at

14   that point?

15        A    I don't remember.  I just know he was heavy to

16   pick up.

17        Q    Do you recall any of his movements while you

18   were picking him up?

19        A    No.

20        Q    Was he complaining of any pain at that point?

21        A    No.

22        Q    Did he appear to be in any pain at that point?

23        A    I don't believe so.

24        Q    Did he have any bruises on him at that point?

25        A    Not that I recall.  Not that I can recall.
```

1      Q    Did you see any blood?

2      A    There may have been from, you know, the

3   concrete floor.  I don't know -- when he hit the floor,

4   I don't know, there may have been blood.

5      Q    Well, putting aside that there may have been,

6   did you see any blood?

7      A    I don't recall.

8      Q    Did you see any scrapes on him?

9      A    I don't recall.

10      Q    Okay.  And what happened after you got him up

11   off the floor?

12      A    I was immediately looked -- someone else took

13   Inmate McCallion and started to escort them, and I was

14   looked at for my eye.

15      Q    Well, what did you physically do after Mr.

16   McCallion was raised off the floor by you and the other

17   officer?

18      A    I handed him off to another officer.

19      Q    Was that Officer Hart?

20      A    I don't recall who it was.

21      Q    When you say you handed him off, what do you

22   mean by that?

23      A    You typically grab them by their -- their

24   handcuffs and -- for security reasons.

25      Q    Now was Mr. McCallion still screaming at this

1   point?

2       A    I -- I don't recall.

3       Q    Well, when's the last point at which you

4   recall him screaming?

5       A    I -- I don't recall if he screamed afterwards

6   or -- this was three years ago, so I can't -- I can't

7   exactly tell you when exactly the screaming stopped.

8       Q    Was he screaming when any of the other

9   officers responded to the bathroom?

10      A    I don't recall.

11      Q    Okay.  So after you handed him off to another

12  officer, what did you do?

13      A    I was taken aside and looked at for my

14  injuries.

15      Q    By whom were you taken aside?

16      A    Probably my supervisor at the time.

17      Q    Well, do you recall someone taking you aside,

18  or do you just know this to be general procedure?

19      A    I just know that my interaction with him was

20  done and I was -- someone was looking at my eye.

21      Q    Did you -- was he escorted out of the bathroom

22  at that point by the officer to whom you handed him off?

23      A    I assume so.

24      Q    Now when the officers arrived, did you tell

25  them what had happened?

1        A    No, that's -- after the situation, I'm away

2    from McCallion, and it's just me, then that's when I

3    can, you know, tell my supervisor what happened.

4        Q    Well, the officers who arrived, did any of

5    them ask you what's going on?  Why is he on the floor?

6        A    I probably said that he was under the

7    influence, or I believed he was under the influence of

8    an intoxicant.

9        Q    Did you tell any of the officers that

10   McCallion lunged at you?

11       A    No.

12       Q    Why not?

13       A    Because I don't have to explain to other

14   officers why I used force.

15       Q    Well, why would you have to explain to them

16   that he's under an intoxicant?

17       A    So they know for their safety.

18       Q    Well, wouldn't it be important for them to

19   know that he just tried to attack an officer?

20              MR. DORANDO:  Objection.  Go ahead.

21              THE WITNESS:  I guess that would be

22   assumed that that's what happened.

23   BY MR. SIVIN:

24       Q    So is it your testimony that you didn't tell

25   any of the officers that Mr. McCallion lunged at you?

1      A    When the initial officers responded, I don't

2    know if I did or didn't.  I told my supervisor that, and

3    that's the only person I have to report to.

4      Q    Okay.  Did you observe any change in Mr.

5    McCallion's physical condition between the time that you

6    first entered the bathroom and the point when you last

7    saw him?

8      A    I don't recall if it -- if it changed or not.

9      Q    Okay.

10     A    It happened so quick that -- and my adrenaline

11   is rushing.  It's kind of a chaotic scene, so I don't

12   remember.

13     Q    Well, had you ever used force against an

14   incarcerated individual prior to that day?

15     A    I don't -- I don't believe so.

16     Q    Had you ever been accused of using excessive

17   force against an individual prior to that day?

18     A    No.

19     Q    Had an incarcerated individual ever filed a

20   grievance against you in connection with the use of

21   force?

22                MR. DORANDO:  Objection.  You --

23                THE WITNESS:  I don't believe so.

24   BY MR. SIVIN:

25     Q    Where did you go from the bathroom after you

1    handed off Mr. McCallion?

2        A    I -- I went back to my desk, grabbed a few

3    things, then I was taken to the infirmary.

4        Q    And your desk was in the dorm?

5        A    Yes, back in the -- yes, it was a different

6    room.

7        Q    Okay.  And who took you to the infirmary?

8        A    I believe my supervisor escorted me.

9        Q    Would that be Sergeant Coffey?

10       A    Yes.

11       Q    At that point, when he took you to the

12   infirmary, did he ask you what had happened?

13       A    Most likely, yes.

14       Q    Well, do you have a recollection of that?

15       A    No, I don't.

16       Q    Okay.

17       A    I don't know exactly when I told them what

18   happened, whether it was in the infirmary, on the dorm.

19       Q    Now were you bleeding at that point?

20       A    I had -- I don't know if it was just a bruise,

21   or a black eye, or bleeding.  I don't -- without -- I

22   know photos were taken, but I don't recall if I was

23   bleeding or not.

24       Q    Okay.  Other than the bruise or black eye,

25   did you suffer any other injuries as a result of this

1    incident?

2        A    No.

3        Q    And did you go directly from the dorm to the

4    infirmary?

5        A    Yes.

6        Q    Now is this the same infirmary to which an

7    incarcerated individual would be taken?

8        A    Yes, but I would imagine he'd be in a

9    different room or --

10       Q    Okay.  And describe the route that one takes

11   to get from that C1 dorm to the infirmary.

12       A    It's --

13               MR. DORANDO:  I'll object to the form.

14   Go ahead.

15               THE WITNESS:  You walk out the front

16   door.  You take a right, and walk a few hundred yards.

17   BY MR. SIVIN:

18       Q    Is that a hallway?

19       A    No, it's outside.

20       Q    Okay.  So -- well, when you exit the bathroom,

21   you're in the dorm area, right?

22       A    Yes, and  more -- when I exit the bathroom,

23   I'm in more of the rec area on the dorm.

24       Q    And then describe how you get from that rec

25   area to outside the dorm.

1        A    You walk approximately -- I don't know, 20

2   feet or so to the front door.

3        Q    And then you exit that front door and just

4   walk a straight path to the infirmary?

5        A    No.  You go out the front door, like I said,

6   and you take a right.

7        Q    And then you'd walk -- is it a sidewalk, or

8   something else, or what?

9        A    It's -- I would take, like, a sidewalk,

10  probably or -- I mean, I don't know exactly how.

11  There's a main road, if you -- if you will, down the

12  main the -- between all the dorms, and then there's a

13  sidewalk.  I don't know exactly which one I took.

14       Q    But in any event, it would just be a straight

15  walk to the infirmary; is that correct?

16       A    Yes.

17       Q    And then the infirmary, would that be directly

18  ahead of you on the right, the left, or something else?

19       A    Once you take that initial right, it would,

20  for the most part, be directly ahead of you.

21       Q    Okay.  And then there's an entrance to the

22  infirmary, correct?

23       A    There is.

24       Q    Now were there any video or surveillance

25  cameras inside the C1 dorm?

1        A    No.

2        Q    Or in the bathroom area?

3        A    No.

4        Q    How about just outside the dorm?

5        A    I don't believe there is.  I'm not sure where

6   exactly the facility cameras are.

7        Q    Okay.  Did you have any type of body-worn

8   camera?

9        A    I did not.

10        Q    Okay.  Now, typically, when an incarcerated

11   individual is brought to an infirmary after use of force

12   incident, is that escort videotaped?

13               MR. DORANDO:  Objection.

14               THE WITNESS:  I'm -- I don't think so.

15   BY MR. SIVIN:

16        Q    Well, have you ever been an escort officer?

17        A    No, I'm a -- at the time, I was just a dorm

18   officer.

19        Q    Have you -- had you ever observed incarcerated

20   individuals being escorted to an infirmary after a use

21   of force incident?

22        A    Yes.

23        Q    And have you ever seen any hand-held cameras

24   being used to record that escort?

25        A    No.

1      Q    Okay.  All right.  So who exited the bathroom

2   first, you or Mr. McCallion?

3      A    I believe he did.  I'm not positive.

4      Q    Well, why did you remain in the bathroom?

5      A    Just because they're looking -- I believe they

6   were looking at my eye to see, you know, my injuries.

7      Q    And who was looking at your eye?

8      A    Again, I don't recall.

9      Q    Was any medical staff looking your eye at that

10  point?

11     A    I don't believe so, no.

12     Q    Okay.  Did you see Mr. McCallion being

13  escorted outside -- out of the bathroom?

14     A    No.  Once I handed him off to another officer

15  to be escorted, that was the last time I saw him.

16     Q    Did you ever again see Mr. McCallion?

17     A    I did not.

18     Q    Now when you went to the infirmary, did you go

19  by yourself or with some other officer or supervisor?

20     A    I believe someone was with me.  I can't tell

21  you if it was an officer or supervisor who was escorted

22  -- or who was walking alongside me.

23     Q    What happened when you got to the infirmary?

24     A    I believe I was taken into one of the nurses

25  offices.

1      Q    Now is it your understanding that Mr.

2   McCallion would have been taken to the infirmary as

3   well?

4      A    Yes.

5      Q    Okay.  Did you see Mr. McCallion in the

6   infirmary?

7      A    I did not.

8      Q    Okay.  Can you describe the infirmary?  What

9   does it look like, how many different rooms are there,

10  and so forth?

11     A    I really can't give you an accurate -- there's

12  -- an accurate description of the infirmary?

13     Q    Well, as best as you can.

14     A    You walk in, and you can take a hallway, I

15  guess, straightforward from the entrance.  And to the

16  left, that's where I believe the nurses stations are.

17     Q    Other than nurses stations on the left, what

18  else is in the infirmary?

19     A    I honestly -- I'm not someone that's down

20  there regularly, so I can't tell you everything that's

21  in there.

22     Q    And what are the nurses stations?

23     A    What are they?

24     Q    What are they?

25     A    I --

1        Q    Describe it.

2        A    A room with desks.

3        Q    And are people examined in the nurses

4   stations?

5        A    I would believe -- yeah, I -- yes.

6        Q    Okay.  Well, were you examined in one of these

7   nurses stations?

8        A    Yes.

9        Q    Okay.  Now you mentioned there on the left.

10  Is there anything on the right?

11       A    More doctors -- there's doctors' offices, I

12  think.  I believe dental, and a few more offices.

13       Q    Okay.  Is there any type of a strip room, or a

14  frisk room, at or around the infirmary?

15       A    I don't -- they have a screen in one of the

16  nurses stations that I believe they use.

17       Q    So you're indicating that if an inmate needed

18  to be frisked or stripped at the infirmary, it would

19  take place in one of the nurses stations?

20       A    I honestly don't know the protocol.  I believe

21  that is it, but --

22       Q    And can you describe this nurses station where

23  you believe these frisks might take place?

24       A    Again, it's a room.  It might have -- I think

25  it has a hospital bed.  Medical --

1        Q    Does the room have a door?

2        A    Yes.

3        Q    Okay.  If the door is closed, can you see into

4   the room?

5        A    Yes.  It has a -- I believe a glass panel of

6   some sort.

7               MR. DORANDO:  Ed, can we take a moment

8   off the record?

9               MR. SIVIN:  Sure.

10              THE REPORTER:  Okay.  We are going off

11  the record at 12:02 p.m. Eastern Standard Time.

12   (Off the record)

13              THE REPORTER:  Okay.  We are back on the

14  record at 12:10 p.m. Eastern Standard Time.

15              You may continue.

16              MR. SIVIN:  Okay.

17  BY MR. SIVIN:

18       Q    So, Officer, when you got to the infirmary,

19  did you go into one of those nurses stations to be

20  examined?

21       A    Yes.

22       Q    And when you went in that nurses station, did

23  a nurse, in fact, examine you?

24       A    She looked at my eye, yes.

25       Q    Was there anyone else in the room with you

1    besides the nurse?

2       A    I don't recall.

3       Q    Was the door open or closed when she was

4    examining you?

5       A    I don't recall.

6       Q    Do you -- which nurse station were you in?

7    Like, the first, second, third, fourth?

8       A    I don't recall.

9       Q    Okay.  Now on the way to the infirmary, did

10   you tell the person you were with what had happened,

11   that Mr. McCallion lunged at you?

12      A    I don't recall if I did or not.

13      Q    Okay.  Well, when you got to the infirmary,

14   the nurse asked you what happened, right?

15      A    They may have.  I -- they were more focused on

16   my eye than figuring out what happened.

17      Q    When you got to the infirmary, did you tell

18   anyone what happened?

19      A    The only person I remember telling was my

20   supervisor at the time, definitively.

21      Q    And that would have been Sergeant Coffey?

22      A    Correct.

23      Q    Okay.  And when, for the first time, did you

24   believe you told Sergeant Coffey?

25      A    I don't -- I don't recall exactly when I told

1    him.

2        Q    Well, was it before you got to the infirmary?

3        A    It may have -- it may have, yes.

4        Q    And how long were you in the infirmary?

5        A    I don't recall exactly.

6        Q    Give me your best estimate.

7              MR. DORANDO:  Objection.  You can answer.

8              THE WITNESS:  I don't recall.

9    BY MR. SIVIN:

10       Q    Was it more than an hour or less than an hour?

11       A    Less than an hour.

12       Q    Okay.  Was it more than a half hour or less

13   than a half hour?

14       A    I don't know.  I don't -- I don't recall.

15       Q    Did you see Mr. McCallion in the infirmary?

16       A    No.

17       Q    Do you know whether or not he was in the

18   infirmary when you were in the infirmary?

19       A    I believe he was in the infirmary about the

20   same time.

21       Q    Okay.  And what makes you believe that?

22       A    Because that's where they would have taken him

23   from the dorm.

24       Q    Okay.  Well, did you overhear Mr. McCallion at

25   any point in the infirmary?

1        A    I did not.

2        Q    Were there other officers in the infirmary

3   when you were there?

4        A    I don't recall.

5        Q    Can you describe Sergeant Coffey?  What did he

6   look like back then?

7        A    I don't have his -- a male, taller than me.

8        Q    Caucasian?

9        A    Yes.

10        Q    Can you give me his approximate height and

11   weight?

12        A    I -- Five-nine, five-ten.  I don't know

13   exactly.

14        Q    How would you characterize his build?

15        A    Broad.

16        Q    Okay.  Now have you ever socialized with

17   Sergeant Coffey?

18        A    No.

19        Q    Okay.  How about Officer Hart?  Have you ever

20   socialized with him?

21        A    No.

22        Q    How about Officer Barbarito?

23        A    No.

24        Q    How about Officer Griffith?

25        A    No.

```
 1          Q    And by that, I mean, have you ever, you know,

 2    been to a bar, a restaurant, an event outside of the

 3    correctional facility with any of these individuals?

 4          A    No.

 5          Q    To your knowledge, had Officer Hart been on

 6    the job longer than you, about the same time as you, or

 7    less than you?

 8          A    I don't know.

 9          Q    How about Barbarito?

10          A    I don't know.

11          Q    How about Griffith?

12          A    I believe I have more time than him.

13          Q    Okay.  What did you do after the infirmary?

14          A    I had to start my -- filing my reports.

15          Q    Use of force reports?

16          A    Yes.

17          Q    Have you ever spoken to Sergeant Coffey about

18    Mr. McCallion between the date of the incident and

19    today?

20          A    Just about these -- these meetings, no.

21          Q    When you say, "these meetings," you mean

22    scheduling the depositions?

23          A    Yes.

24          Q    How about with Officer Hart?  Have you had any

25    conversations with him about Mr. McCallion between the
```

1    date of the incident and today?

2        A    No.  Other than the dep -- scheduling of the

3    deposition, no.

4        Q    And would that be the same with Barbarito?

5        A    Yes.

6        Q    And how about Griffith?  Same answer?

7        A    Yes.

8        Q    Now sitting here today, are you aware that Mr.

9    McCallion claims that he was assaulted by officers in

10   the strip room?  You're aware that he's making that

11   claim?

12       A    I am aware.

13       Q    Okay.  And have you ever asked Officer Hart,

14   or Officer Barbarito, or Officer Griffith about those

15   accusations?

16       A    No.

17       Q    How about Sergeant Coffey?

18       A    No.

19       Q    Now do you know one way or the other whether

20   Coffey was in the infirmary when McCallion was in the

21   infirmary?

22       A    Can you repeat the question?

23       Q    Do you know whether Sergeant Coffey was in the

24   infirmary when McCallion was in the infirmary?

25       A    He may have been in the vicinity.

1        Q    Do you know one way or the other whether he

2    was inside the infirmary when McCallion was in the

3    infirmary?

4        A    Definitively, no, I can't tell you.

5        Q    Do you know whether Coffey was in the

6    infirmary when you were in the infirmary?

7        A    When I was getting checked by medical staff,

8    no, I can't definitively say.

9        Q    How about Hart?  Do you know if he was in the

10   infirmary when you were in the infirmary?

11       A    I can't say.

12       Q    How about Barbarito?

13       A    I don't recall for any of them.

14       Q    How about -- so the same answer with Griffith?

15       A    Yes.

16       Q    Can you identify any officers or supervisors

17   who were in the infirmary when you were in the

18   infirmary?

19       A    No.

20       Q    Did you know an incarcerated individual named

21   Miguel Sliger, S-L-I-G-E-R?

22       A    I do not know.

23       Q    Other than being looked at -- your eye being

24   looked at in the infirmary, did you receive any other

25   evaluation or treatment of any injuries that you claim

1   you sustained in this incident?

2       A    Other than just asking if I had any other

3   injuries that I was aware of.

4       Q    And who asked you that?

5       A    I believe the nurse.

6       Q    This was that day in the infirmary?

7       A    Yes, during the evaluation.

8       Q    And did you claim that you had any other

9   injuries?

10      A    No.

11      Q    Did you take any time off from work as a

12  result of this incident?

13      A    No.

14      Q    Before October 28th, 2020, had you ever known

15  of any incarcerated individuals to use K2 at Gouverneur?

16              MR. DORANDO:  Objection.  You can answer.

17              THE WITNESS:  I -- specifically, K2, I

18  knew inmates were under the -- were under -- could be

19  under the influence of intoxicants.

20      Q    Did that include K2?

21      A    K2 is one of them, yes.

22      Q    Had you ever observed any adverse reactions by

23  any inmates who would use K2?

24              MR. DORANDO:  Objection.  You can answer.

25              THE WITNESS:  Yes.

1  BY MR. SIVIN:

2      Q    And describe what you recall in that respect.

3      A    Pertaining to McCallion or other -- you want

4  other?

5      Q    Others, yeah.

6      A    Same kind of behavior -- erratic behavior.

7      Q    Screaming?

8      A    Yes.

9      Q    Pacing?

10     A    Yes.

11     Q    Sweating?

12     A    Sweating, yes.

13     Q    Okay.  So would you say that what you observed

14  with respect to Mr. McCallion that day was the same that

15  you had observed with other incarcerated individuals who

16  had been under the influence of K2?

17          MR. DORANDO:  Objection.  Go ahead.

18          THE WITNESS:  It could be, but I'm not a

19  medical -- so I -- my first thing is to make sure the

20  inmate is okay and to make sure -- look out for their

21  safety.

22     Q    Did you testify at a tier hearing in

23  connection with this incident?

24     A    I don't recall.

25     Q    Did you testify at an OSI hearing, what's

```
 1   known as, like, a Q and A?

 2        A    Yes.

 3        Q    Okay.  And have you -- have you had an

 4   opportunity to review your testimony in that regard?

 5        A    The -- I believe so.  The OSI report?

 6        Q    No, no.  Your testimony at OSI?

 7        A    Like, the recording?

 8        Q    Yes.

 9        A    No.

10        Q    How about a transcript of the testimony?

11        A    I believe I've seen a summary of the

12   transcript -- or the trans -- summary, I guess, of it.

13        Q    Well, have you seen an actual transcript?

14   Question, answer where you're sitting --

15        A    No.

16        Q    Okay.  Did you have a partner during that

17   tour?

18        A    No, it's just me on the dorm.

19        Q    Okay.  No other officers assigned to the dorm

20   during your shift?

21        A    No.

22        Q    When you were working, did you have a name

23   tag?

24        A    I did.

25        Q    Were you required to wear a name tag?
```

1        A    As part of our uniform, yes.

2        Q    And what exactly does the name tag say?

3        A    My -- M. Marra.

4        Q    Okay.  And were all the officers of Gouverneur

5   required to wear name tags while on duty?

6        A    As part of their -- yes.

7        Q    Do you know Officers Weidner, W-E-I-D-N-E-R,

8   and Jackson?

9        A    Yes.

10        Q    Have you spoken with them at all about Mr.

11   McCallion?

12        A    No.

13             MR. SIVIN:  Okay.  I'd like to ask the

14   reporter to put up on the screen Plaintiff's Exhibit 1.

15             THE REPORTER:  Yes, one moment.

16             Is everyone able to see that?

17             MR. SIVIN:  Yeah.  There's something in

18   front of it, though, that says "rearranged videos on the

19   stage."

20             THE REPORTER:  I believe that's on your

21   end.  That you can --

22             MR. SIVIN:  Okay.  I can see it.

23        (Exhibit 1 marked for identification.)

24   BY MR. SIVIN:

25        Q    Can you see that, Officer?

1       A    Yes.

2       Q    And is that a misbehavior report you filled

3    out in connection with the incident involving Mr.

4    McCallion?

5       A    It is.

6       Q    Now the report is dated October 28th, 2020.

7    Can you tell me at approximately what time you filled

8    out the report?

9       A    I filled out the report?  I can't definitively

10   tell you.

11      Q    Can you give me some estimate as to when you

12   filled it out?  Was it before your shift ended at 11:00,

13   after your shift, the next day?

14      A    I don't rec all.

15      Q    Did you fill it out that day or the following

16   day?

17      A    It was that night.

18      Q    Okay.

19           MR. SIVIN:  All right.  Let's go to

20   Plaintiff's Exhibit 2, please.

21      (Exhibit 2 marked for identification.)

22   BY MR. SIVIN:

23      Q    And by the way, Officer, you had a chance to

24   review your -- Plaintiff's Exhibit 1, the misbehavior

25   report, in preparation for your deposition today; is

1    that correct?

2         A    I did.

3         Q    Okay.  Plaintiff's Exhibit 2 is a two-page

4    report.  It's the use of force report.  Is that the use

5    of force report that you filled out in connection with

6    this incident?

7         A    Yes.

8         Q    Okay.  And do you recall what time you filled

9    out that report?

10        A    I don't.

11                  MR. SIVIN:  All right.  Let's go to

12   Plaintiff's Exhibit 3.

13        (Exhibit 3 marked for identification.)

14   BY MR. SIVIN:

15        Q    Okay.  Now this is a To From memorandum, but

16   the names have been redacted, so I can't tell.  Is this

17   your handwriting?

18        A    It is not.

19        Q    Okay.  So you had a chance to review this

20   document as well in preparation for your deposition,

21   correct?

22        A    Yes.

23        Q    So you're saying the officer who generated

24   this memorandum, that's someone other than you?

25        A    Yes.

1      Q    Okay.  So you did not accompany Mr. McCallion

2  to the hospital; is that correct?

3      A    No, I did not.

4      Q    Okay.  Do you know who this officer is?

5      A    I -- no, I don't know who that is.

6      Q    Well, did you know another officer on duty at

7  approximately 11:00 p.m. with the first initial M for

8  his last name?

9      A    M?  No, I don't recall.

10     Q    Okay.

11          MR. SIVIN:  All right.  Let's go to

12  Plaintiff's Exhibit 4.

13     (Exhibit 4 marked for identification.)

14          MR. DORANDO:  Just for the record, I've

15  printed out copies of these.  And so if he looks over my

16  direction, I just have --

17          MR. SIVIN:  Yeah.

18          MR. DORANDO:  -- a copy of it in front of

19  us.

20          MR. SIVIN:  Yeah, that's why I  did it.

21  I think it's easier that way.

22  BY MR. SIVIN:

23     Q    All right.  Plaintiff's Exhibit 4 is an

24  employee accident injury report.  You had a chance to

25  review this as well, correct?

```
 1         A    I did.

 2         Q    Is there anything on this report that is in

 3    your handwriting?

 4         A    That is?  Yes.

 5         Q    Okay.  And identify for me what's in your

 6    handwriting.

 7         A    All of it, besides where it says, "Use of

 8    Force 20-0040," and the statement of the supervisor, and

 9    the supervisor's name, and signature, and date, and the

10    bottom --

11         Q    Okay.  Actually -- well -- so most of it's in

12    your handwriting, correct?

13         A    The top half.  Most of it is, yes.

14         Q    All right.  So starting with the top half, if

15    you can identify it with the numbers of the boxes, tell

16    me what's not in your handwriting.

17         A    What is not?  So in box 12, where it says,

18    "Use of Force Number 20-0040."

19         Q    Okay.  Continue.  What else is not in your

20    handwriting going down in the report?

21         A    Where -- line 16, where it says, "I agree with

22    what was reported to me."

23         Q    That's not in your handwriting, correct?

24         A    No.

25         Q    Am I correct?
```

1          A     Yes.

2          Q     Okay.  Continue down.

3          A     Line 17.

4          Q     All right.  That's all in someone else's

5     handwriting, correct?

6          A     Correct.

7          Q     And then the -- from 21 down, is that all in

8     somebody else's handwriting?

9          A     Yes.

10         Q     Okay.

11                    MR. SIVIN:  Let's go to Plaintiff's

12    Exhibit 5, which is a series of photographs.

13         (Exhibit 5 marked for identification.)

14                    MR. DORANDO:  You may want to look at the

15    screen for this one just

16                    THE WITNESS:  Okay.

17                    MR. DORANDO:  -- because those are --

18    those will be in color.  These are in black and white.

19                    THE WITNESS:  Okay.

20    BY MR. SIVIN:

21         Q     All right.  Now the second page of those

22    photographs, you see there's three photographs of an

23    individual on that page.  Do you see that?

24                    MR. DORANDO:  Can you put up --

25                    MR. SIVIN:  Can you go to the second

1   page?

2                    MR. DORANDO:  -- page 2 on the screen?

3    BY MR. SIVIN:

4        Q    Okay.  And do you have the hard copies in

5    front of you as well, Officer?

6        A    Yes, they're just black -- they're black and

7    white.

8        Q    Oh, okay.  So looking at the color copies that

9    have been marked as Plaintiff's Exhibit 5, the bottom

10   right photograph, do you see that one?

11       A    Yes.

12       Q    And do you see those red areas on Mr.

13   McCallion's back?

14       A    Yes.

15       Q    Do you know how those red areas got to be

16   there?

17       A    I don't know.

18       Q    Okay.  Well, is there anything about your

19   interaction with Mr. McCallion that you believe would --

20   resulted in those red areas on his back?

21                    MR. DORANDO:  I'm going to object.  Go

22   ahead.

23                    THE WITNESS:  I don't know.

24   BY MR. SIVIN:

25       Q    Okay.  And let's go to the third page.  And do

1    you see the photograph of Mr. McCallion's neck with --

2    the red mark -- red marks on his neck?

3         A    Yes.

4         Q    Do you know how he got those red marks?

5         A    I do not.

6         Q    Was there any physical contact between you and

7    Mr. McCallion, or Mr. McCallion and the floor that you

8    feel would have resulted in those red marks?

9              MR. DORANDO:  Objection.  You can answer.

10   THE WITNESS:  There could have been, but I don't -- I

11   don't know.

12   BY MR. SIVIN:

13        Q    Okay.  In other words, you -- do you recall

14   anything that, in your opinion, would have resulted in

15   those red marks?

16             MR. DORANDO:  Objection.  Go ahead.

17             THE WITNESS:  No.

18   BY MR. SIVIN:

19        Q    Okay.  And -- then there's a picture of Mr.

20   McCallion's back with red marks at various areas.

21   Again, looking at that photograph, can you account for

22   how those areas got reddened?

23        A    That could have been from the struggle on the

24   -- on the floor.

25        Q    Well, during the struggle, did you ever strike

1    him in the back?

2        A    No.

3        Q    Did you ever knee him in the back?

4        A    No.

5        Q    Did you see his back make physical contact

6    with anything during the struggle?

7        A    Not that I can recall.

8        Q    Okay.

9                MR. SIVIN:  All right.  Let's go to

10   Plaintiffs Exhibit 6.

11       (Exhibit 6 marked for identification.)

12   BY MR. SIVIN:

13       Q    And you reviewed this document as well in

14   preparation for your testimony today?

15       A    Yes.

16       Q    Okay.  Now this purports to be a summary of an

17   interview that was conducted of you by Investigator

18   Graziano; is that correct?

19       A    Yes.

20       Q    And does that summary accurately reflect what

21   you told Investigator Graziano?

22       A    I believe so.

23       Q    Okay.  Now when for the first time did you

24   know that Mr. McCallion was diagnosed with four

25   fractured ribs?

1              MR. DORANDO:  Objection.

2              THE WITNESS:  I don't recall exactly when

3    I -- when I found out.

4    BY MR. SIVIN:

5        Q    Was it before or after this interview?

6        A    Be -- oh, this?  Before.

7        Q    Okay.  Now was this interview recorded as

8    well?  Was there a tape recorder there at the time?

9        A    Yes.

10       Q    And have you heard a transcript of that

11   recording?

12       A    No.

13       Q    Do you see somewhere in the middle of this

14   summary it says, quote, He confirmed that he landed on

15   the inmate's left side as both went to the floor, end

16   quote.  Do you see that?

17       A    I do.

18       Q    Okay.  And did you tell Officer Graziano that

19   you landed on Mr. McCallion's left side?

20       A    Yes.

21       Q    Before this interview, which took place about

22   three months after the incident, had you ever told

23   anyone that you landed on McCallion's left side?

24       A    No.

25       Q    Okay.

1                    MR. SIVIN:  Let's go on to Plaintiff's

2    Exhibit 7.

3         (Exhibit 7 marked for identification.)

4    BY MR. SIVIN:

5         Q    Is this logbook entries for C1 dorm during the

6    shift you were working at this time?

7         A    It is.

8         Q    Now let's go down to the bottom, 10:15.  You

9    see that?

10        A    Ten -- yes.

11        Q    Okay.  To the left of that appears to say

12   "LE."  Do you know what that refers to?

13        A    Late entry.

14        Q    And is that in your handwriting, that 10:15

15   entry?

16        A    It is not.

17        Q    Okay.  Do you know who wrote that?

18        A    I do not.

19        Q    Is anything in this logbook in your

20   handwriting?

21        A    Yes.

22        Q    Can you tell me what's in your handwriting?

23        A    Where do you want me to start?

24        Q    Well, let's start at the top.

25        A    Okay.  So the date -- it says date, tour --

```
 1        Q    Yep.

 2        A    -- beginning, the CO on duty, the sergeant,

 3   print --

 4        Q    So, basically, everything that's filled out

 5   next to that preprinted area, it would be in your

 6   handwriting?

 7        A    Other than the end -- the end number next to

 8   inmate count, and where it says --

 9        Q    Okay.  And how --

10        A    Go ahead.

11        Q    And how about the time entries, starting with

12   2:55, going down to 10 p.m.?  Were any of those in your

13   handwriting?

14        A    Yes, all of them, besides the three -- it

15   might be 3:12.

16        Q    What does it say next to that?  Oh, yeah.

17   Okay.

18        A    It says -- that's my -- I believe my area

19   supervisor's signature.

20        Q    Anything else not in your handwriting during

21   these time entries?

22        A    Yeah, everything is my handwriting up until

23   9:23.

24        Q    Okay.

25                  MR. SIVIN:  And let's go on to Exhibit 8.
```

1          (Exhibit 8 marked for identification.)

2     BY MR. SIVIN:

3          Q    Is this a notification that you are to respond

4     and give testimony in connection with this incident?

5          A    Yes.

6          Q    And did you give that testimony?

7          A    Yes.

8          Q    And was that different than the interview that

9     you gave to Investigator Graziano that was documented in

10    that report of interview that we marked as Plaintiff's

11    Exhibit 6?

12         A    I believe it's the same thing.

13              MR. SIVIN:  Okay.  So, Nick, I would like

14    to just listen to that audio recording before I conclude

15    the deposition.

16              MR. DORANDO:  Yeah.

17              MR. SIVIN:  Is it uploaded now?

18              MR. DORANDO:  They haven't emailed me,

19    but I'll check the cloud to see if they've got it.

20              MR. SIVIN:  Okay.  All right.  Why don't

21    we just go off the record for a couple minutes?

22              THE REPORTER:  Okay.  We are going off

23    the record at 12:41 p.m. Eastern Standard Time.

24         (Off the record)

25              MR. DORANDO:  So I was able to get a hold

1    of the person about 10 minutes ago, and she said that

2    she was uploading it as we were talking, so I've been

3    dialing her back to see what the hold up is.

4                    MR. SIVIN:  All right.  If you want -- if

5    we could -- I mean, I may not have any more questions

6    for him after listening to the audio tape, but I might.

7                    MR. DORANDO:  Yeah.  So -- I'm fine --

8    he's going to be staying here throughout the second

9    guy's deposition no matter what.

10                    MR. SIVIN:  Okay.  So why don't we start

11    with Barbarito?

12                    MR. DORANDO:  So that was my thought as

13    well, while we go on to the next one, and then if we

14    need to bring him back --

15                    MR. SIVIN:  Okay.

16                    MR. DORANDO:  -- and continue, then we'll

17    go from there.

18                    MR. SIVIN:  That sounds good.

19                    MR. DORANDO:  All right.  Give me five

20    minutes.  I'll be right back.

21                    MR. SIVIN:  Okay.

22            (Proceedings concluded at 12:59 p.m.)

23                    (Signature reserved.)

24                    * * * * *

25

```
 1                  CERTIFICATE OF REPORTER

 2

 3          I, Kimberly Costanza, hereby certify:

 4          That the foregoing proceedings were taken

 5   before me at the time and place therein set forth;

 6          That the proceedings were recorded by me and

 7   thereafter formatted into a full, true, and correct

 8   transcript of same;

 9          I further certify that I am neither counsel

10   for nor related to any parties to said action, nor in

11   any way interested in the outcome thereof.

12

13          DATED, this 12th day of April 2023.

14

15

16          _____

17          Kimberly Costanza, CER-

18          Certified Electronic Reporter

19

20

21

22

23

24

25
```

E R R A T A   S H E E T

Witness:  Matthew Marra

Case Name: McCallion v. C.O. Matthew Marra, et al.

Deposition Date:  Friday, March 24, 2023

PAGE   LINE   CHANGE FROM/TO    REASON FOR CHANGE

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

_____  _____  _____   _____

Under penalties of perjury, I declare that I have

read the foregoing deposition and hereby affix my

signature that same is true and correct, except as noted

above.

_____        _____

MATTHEW MARRA                   Date

Sworn to before me this ____ day of _____, 20___

_____

Notary Public