UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL MCCALLION,<br><br>  PLAINTIFF,<br><br>v.<br><br>C.O. MATTHEW MARRA, ET AL.<br><br>  DEFENDANTS. | Case No. 9:22-cv-00253<br><br>RESPONSE TO DEFENDANTS'<br>STATEMENT OF MATERIAL FACTS<br>AND ADDITIONAL STATEMENT OF<br>FACTS IN DISPUTE |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1(b) of the Local Rules of this Court, Plaintiff responds to Defendants' Statement of Material Facts ("Defs.' SOMF"), as to which Defendants contend no genuine issue exists, as follows:

1. "Plaintiff was housed at Gouverneur Correctional Facility ("Gouverneur") between October 28, 2020 and November 5, 2020, which includes the time period at issue. Dorando Decl. Exh. B; ECF No. 20."

   **1. Response**: Does not dispute.

2. "Defendant Matthew Marra began his training as a Correction Officer at the academy on January 25, 2016. Marra Decl at 6."

   **2. Response**: Does not dispute.

3. "Defendant Marra's academy training lasted eight weeks and included, among other job skills, training on the use of force. *Id*."

   **3. Response**: Does not dispute.

4. "This training included ascertaining the appropriate circumstances to employ force. *Id*."

    **4. Response**: Does not dispute.

    5. "Defendant Marra receives yearly training on the Use of Force, and is familiar with the directives governing Use of Force. Marra Decl at 7."

    **5. Response**: Does not dispute.

    6. "On October 28, 2020, at approximately 9:00 P.M. Plaintiff was housed in the C1 Dorm. Dorando Decl. Exh. A at p. 30, 35."

    **6. Response**: Does not dispute.

    7. "Another incarcerated individual, known to Plaintiff as "Shaggy," offered Plaintiff a cigarette containing synthetic Marijuana ("K2"), which Plaintiff smoked, getting "giddy and stoned". *Id* at p.29-34."

    **7. Response**: Does not dispute.

    8. "At approximately 9:50 P.M., Defendant Marra was making security rounds in the sleeping area of the C1 Dorm. Marra Decl. at 11."

    **8. Response**: Does not dispute.

    9. "At that time, he heard loud, distressed screaming and yelling coming from the C1 Dorm bathroom, and immediately went to investigate. *Id* at 12-13."

    **9. Response**: Plaintiff denies that Marra heard loud, distressed screaming and yelling from the C1 Dorm bathroom, since neither Plaintiff "nor anyone else in the bathroom was yelling, screaming, or acting in a manner that one reasonably could interpret as being in distress." *See* Declaration of Edward Sivin ("Sivin Decl."), **Exhibit 1** ("McCallion Decl.") at ¶ 2.

    10. "Incarcerated individuals appeared to be fleeing the bathroom, and Defendant Marra entered the C1 Dorm bathroom seconds later. Marra Decl. at 14; Dorando Decl. Exh. A at p. 36."

**10. Response**: Plaintiff denies that incarcerated individuals fled the bathroom before Marra arrived. Instead, after Marra arrived in the bathroom and ordered everyone to leave, other incarcerated individuals "complied and quickly exited the bathroom." McCallion Decl. ¶ 3.

11. "When Defendant Marra arrived, he saw Plaintiff screaming, and ordered the remaining incarcerated individuals to go to their cubes by ordering them to go to count. Marra Decl. at 15-17."

**11. Response**: Plaintiff denies that Marra saw Plaintiff screaming, since neither Plaintiff "nor anyone else in the bathroom was yelling, screaming, or acting in a manner that one reasonably could interpret as being in distress." McCallion Decl. ¶ 2.

12. "Defendant Marra asked Plaintiff what was going on, but did not approach Plaintiff, remaining in the doorway. Marra Decl. at 19; Dorando Decl. Exh. A at p. 36."

**12. Response**: Does not dispute.

13. "Plaintiff then approached Defendant Marra. Dorando Decl. Exh. A at p. 37."

**13. Response**: Plaintiff admits that he "approached" Marra only to the extent that, in an attempt to comply with Marra's directive that everyone exit the bathroom, Plaintiff walked past Marra, who was standing in the bathroom's exit at that time. *See* McCallion Decl. ¶ 3.

14. "Defendant Marra stated that the circumstances he encountered, along with Plaintiff's rapid approach and lunge, placed him in fear of imminent physical force by Plaintiff. Marra Decl. at 20."

**14. Response**: Plaintiff admits that Marra states as much in his declaration, but denies that Marra's claim has any basis in fact. Specifically, Plaintiff denies that he lunged at Marra, or even that he approached Marra in a rapid manner. *See* McCallion Decl. ¶ 3.

15. "Using only hand holds, Defendant grabbed Plaintiff on his upper torso area, leaned his hip into Plaintiff, and took Plaintiff to the ground. *Id* at 21; Dorando Decl. Exh. A at pp. 37-38, 71."

**15. Response**: Plaintiff admits that Marra took him to the ground, but denies that he did so in the benign manner characterized by Marra. Instead, "[a]fter [Plaintiff] was attempting to walk past Officer Marra, and was already facing *away* from him, [Plaintiff] felt [Marra] grab [him] from behind by one of [his] arms and twist it behind [his] back. Then, without warning, and without first saying anything to [Plaintiff], Officer Marra did what seemed like some type of judo maneuver, or something that one would see in a World Wrestling Foundation event—i.e., he thrust his hip into [Plaintiff], flipped [him] in the air, and body-slammed [him] to the ground." McCallion Decl. ¶ 4 (emphasis in original).

16. "Plaintiff landed face-first on the ground, and Defendant Marra landed on top of him. *Id*, Dorando Decl. Exh. A at p. 38."

**16. Response**: Does not dispute.

17. "Defendant Marra maintained control of Plaintiff through body holds. Marra Decl. at 22; Dorando Decl. Exh. A at p. 39-40."

**17. Response**: Does not dispute.

4

18. "Defendant Marra pressed a button on his radio to activate a Personal Alarm System ("PAS"), sending an alarm to the arsenal to dispatch a response team. Marra at 22; Dorando Decl. Exh. A at p. 39."

**18. Response**: Does not dispute.

19. "Plaintiff was on the ground approximately twenty to thirty seconds before the response team arrived. *Id* at 23; Dorando Decl. Exh. A at p.40."

**19. Response**: Does not dispute.

20. "Defendant Marcus Hart handed Defendant Marra mechanical restraints, which Defendant Marra applied, and resistance ceased. Marra Decl. at 24, 26; Dorando Decl. Exh. A at p. 39."

**20. Response**: Plaintiff admits that Defendant Marcus Hart handed Marra mechanical restraints, which Marra applied, but denies that he ever posed any "resistance" to Marra. *See* McCallion Decl. ¶ 4.

21. "Once Plaintiff stopped resisting, no more force was used. Marra Decl. 26-29; Dorando Decl. Exh. A at pp. 41-42."

**21. Response**: Plaintiff admits that Marra used no more force against him, but denies that he ever posed any "resistance" to Marra. *See* McCallion Decl. ¶ 4.

22. "Plaintiff admits that only physical contact between Plaintiff and Defendant Marra was "taking [him] to the ground and applying …mechanical restraints." Dorando Decl Exh. A at p. 71."

**22. Response**: Plaintiff admits that Marra took him to the ground, but denies that he did so in the benign manner characterized by Marra. Instead, "[a]fter [Plaintiff] was attempting to walk past Officer Marra, and was already

5

facing *away* from him, [Plaintiff] felt [Marra] grab [him] from behind by one of [his] arms and twist it behind [his] back. Then, without warning, and without first saying anything to [Plaintiff], Officer Marra did what seemed like some type of judo maneuver, or something that one would see in a World Wrestling Foundation event—i.e., he thrust his hip into [Plaintiff], flipped [him] in the air, and body-slammed [him] to the ground." McCallion Decl. ¶ 4 (emphasis in original).

23. "The technique Defendant Marra used to take Plaintiff to the ground, and subsequently restrain him while he was awaiting the arrival of responding staff was a DOCCS' taught and trained technique. Marra Decl. at 25."

**23. Response**: Plaintiff denies. The maneuver that Marra used to bring Plaintiff to the ground was one that Marra had used hundreds of times as a varsity wrestler, before his career with DOCCS. *See* Sivin Decl. **Exhibit 2** ("Marra Dep."), at 29-34, 71. Neither the Use of Force Directive submitted by Defendants in support of their motion, nor any other documentation submitted by Defendants, supports the claim that this violent body slam was a 'DOCCS' taught and trained technique."

24. "Defendant Marra was taken to the infirmary to be evaluated by medical staff following the use of force. Marra Decl. at 29-31."

**24. Response**: Does not dispute.

25. "Plaintiff was taken to the infirmary for his own medical evaluation by responding staff. Marra Decl. at 29; Dorando Decl. Exh. A at pp. 42, 49-52

**25. Response**: Does not dispute.

26. "Plaintiff did not sustain any injuries from the use of force involving Defendant Marra. Dorando Decl. Exh. A at p. 71."

6

**26. Response**: Plaintiff denies. The cited portion of Plaintiff's deposition transcript, *see* Dorando Decl. Exh. A, at 71-72, recites only Plaintiff's non-medical opinion that his *fractured ribs* were the result of a use of force by officers who escorted Plaintiff from the scene of the incident to a strip frisk room in the infirmary. Defendants, however, deny that any force was used against Plaintiff after Marra used force against him, *see* Sivin Decl. **Exhibit 4** ("Incident Memoranda") at 2, 4-7, and have claimed throughout this litigation that Plaintiff likely suffered his broken ribs when Marra slammed him to the ground. *See* Marra Dep. at 32-34, 71 (Marra opining that the force of bringing Plaintiff to the ground and Marra then landing on Plaintiff's side caused Plaintiff's rib fractures); *see also* Sivin Decl. **Exhibit 3** ("Coffey Dep."), at 78-80, 90 (Coffey, who was Marra's supervisor and a self-described former "state finalist wrestler," and was present at the scene, concurring that Plaintiff's broken ribs could have been caused by the body slam because after Marra fell on top of Plaintiff, Marra's balled fist reportedly made contact with Plaintiff's ribs.). Further, a "Use of Force, - Part B- Addendum," which was generated by DOCCS following Marra's use of force against Plaintiff, diagnosed plaintiff with multiple injuries, including discoloration, redness, and swelling to the right eye, abrasions to the neck, and multiple reddened areas to the back. *See* Sivin Decl. **Exhibit 5** ("Part B Addendum"). An anatomical diagram of Plaintiff's injuries included in the report also documents injury to the left side of Plaintiff's back. The report further documents that Plaintiff was transferred by ambulance from the prison infirmary to the emergency room of Gouverneur Hospital. *See id*. Certified records from Gouverneur Hospital include a report of an x-ray exam that states the following: "Impression: Acute non-displaced fractures of the left 7, 8, 9, 10 anterolateral ribs. No pneumothorax." *See* Sivin Decl. **Exhibit 6** ("Gouverneur Records").

27. "Defendant Marra did not accompany Plaintiff to the infirmary for Plaintiff's medical evaluation, and did not have any interactions with Plaintiff after the use of force. Marra Decl. at 29-31; Dorando Decl. Exh. A at p. 71."

27. **Response**: Does not dispute.

28. "Defendant Marra completed a Use of Force Report defining the scope of the force used. Marra Decl. at 32; Exh. B."

28. **Response**: Plaintiff admits that Marra completed a Use of Force Report, but denies that the report accurately defined the scope of the of the force used by Marra. *See supra* Response to Defs.' SOMF ¶ 15.

29. "Defendant Marra issued Plaintiff a misbehavior report charging Plaintiff with violating the following rules: Rule 104.11 – Violent Conduct, Rule 104.13 – Disturbance, and Rule 107.10 Interference. Marra Decl. at 34; Exh. C."

29. **Response**: Does not dispute.

30. "Sergeant Joseph Coffey subsequently issued Plaintiff a second misbehavior report, charging him with the following rule violations: Rule 113.13 – Alcohol/Intoxicant, and Rule 113.24 – Drug Use. *Id.*"

30. **Response**: Does not dispute.

31. "Plaintiff was subsequently found guilty of all the charges in these misbehavior reports. *Id.*"

31. **Response**: Does not dispute.

32. "Plaintiff claims that he was involved with a second use of force that occurred in the infirmary, where Plaintiff allegedly sustained injuries. *See, generally* Dorando Decl. Exh. A at pp. 44-48, 71."

32. **Response**: Does not dispute.

33. "Defendant Marra was not present when this use of force allegedly occurred. Dorando Decl. Exh. A at pp.71 - 72."

**33. Response**: Does not dispute.

34. "On November 5, 2020, Defendant Weidner was a Correction Officer assigned to Special Housing Unit ("SHU") Number 2, and Defendant Jackson was a resource officer; both were working on the 3 P.M. – 11 P.M. tour. Weidner Decl. at 6; Jackson Decl. at 6."

**34. Response**: Does not dispute.

35. "SHU Logbooks written contemporaneously show that at approximately 6:40 P.M. on November 5, 2020, Defendants Weidner and Jackson were assigned to take Plaintiff out of his cell for interviewing and photographs, per Sergeant Villeneuve. Weidner Decl. at 7, Exh. A; Jackson Decl. at Exh. 7."

**35. Response**: Does not dispute.

36. "Defendants retrieved Plaintiff from his cell, and took him to a strip frisk room, as directed, where photographs of Plaintiff were taken, and Plaintiff was interviewed. *Id*."

**36. Response**: Does not dispute.

37. "At that time, Plaintiff was photographed with one of the escorts present, though neither officer recalls specifically who remained in the room. Weidner Decl. at 8; Jackson Decl. at 8."

**37. Response**: Plaintiff admits that Weidner and Jackson state as much in their declarations, but denies that the trier of fact will be required to credit those claims. Specifically, Plaintiff asserts that both Weidner and Jackson were present when he was photographed. *See* McCallion Decl. ¶ 8.

38. "Plaintiff was then interviewed in private, without either escort officer present. *Id*."

**38. Response**: Plaintiff admits that Weidner and Jackson state as much in their declarations, but denies that the trier of fact will be required to credit those claims.

39. "Defendants Weidner and Jackson did not hear the interview, and did not know what the interview was about. Weidner Decl. at 9; Jackson Decl. at 9."

**39. Response**: Plaintiff admits that Weidner and Jackson state as much in their declarations, but denies that the trier of fact will be required to credit those claims. Specifically, Plaintiff asserts that both Weidner and Jackson were present when he was photographed. *See* McCallion Decl. ¶ 8.

40. "Once Plaintiff was photographed and interviewed, Defendants returned Plaintiff to his cell without incident. Weidner Decl. at 10; Jackson Decl. at 10."

**40. Response**: Plaintiff denies that he was returned to his cell without incident. Instead, Plaintiff maintains that he was beaten by Weidner and Jackson after the interview. *See* McCallion Decl. ¶ 8.

41. "Defendants resumed their regularly-scheduled rounds thereafter. Weidner Decl. at 11, Exh. A; Jackson Decl. at 11"

**41. Response**: Does not dispute.

42. "Neither Defendant Weidner nor Jackson has any specific recollection of interacting with Plaintiff while he was in the SHU; nor did either Defendant have a prior relationship with Plaintiff. Weidner Decl. at 15; Jackson Decl. at 15."

**42. Response**: Plaintiff admits that neither Weidner nor Jackson claimed to have any specific recollection of having interacted with Plaintiff

10

while he was in the SHU, but denies that the trier of fact will be required to credit those claims.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH IT IS CONTENDED THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED**

Pursuant to Rule 56.1(b) of the Local Rules of this Court, Plaintiff contends that the following assertions of fact are disputed:

1. When Marra entered the bathroom on October 28, 2020, Plaintiff and the other incarcerated individuals were laughing, dancing, and otherwise acting silly. However, no one was yelling, screaming, or acting in a manner that one reasonably could interpret as being in distress. *See* McCallion Decl. ¶ 2.

2. Plaintiff attempted to exit the bathroom, in compliance with Marra's order. *See id.* at ¶ 3.

3. At no point did Plaintiff lunge at Marra, raise a hand to him, approach him in a rapid manner, or do anything else that could reasonably be interpreted as an attempt to assault or threaten Marra. *See id.*

4. As he was attempting to walk past Marra, and was already facing *away* from him, Plaintiff felt Marra grab him from behind by one of his arms and twist it behind his back. Then, without warning, and without first saying anything to Plaintiff, Marra did what seemed to Plaintiff like some type of judo maneuver, or something that one would see in a World Wrestling Foundation event—i.e., he thrust his hip into Plaintiff, flipped him in the air, and body-slammed him face-first to the concrete floor, causing him to sustain physical injuries. *See id.* at ¶ 4.

5. Marra is a former varsity wrestler, and in that capacity had executed this maneuver hundreds of times. *See* Marra Dep. at 29-34, 71.

6. After being slammed to the ground, Plaintiff lay stunned and immobile while Marra placed him in handcuffs behind his back, without his posing any resistance. *See* McCallion Decl. ¶ 4.

12

7. Marra then activated his personal alarm system, causing other officers to respond to the scene. *See id.* at ¶ 5.

8. When the other officers responded, Marra falsely told them that he brought Plaintiff to the ground because Plaintiff had lunged at him. *See id.*

9. Plaintiff then was taken from the scene by the other officers to an infirmary strip frisk room, where additional force was used against him, causing him to sustain additional physical injuries. *See id.* at ¶ 6.

10. From the strip frisk room, Plaintiff was taken to the prison's infirmary in severe pain, particularly in his left ribs, and started to experience what felt like a seizure. *See id.* at ¶ 7.

11. Medical records from the prison's infirmary document multiple injuries to Plaintiff, including discoloration, redness, and swelling to the right eye, abrasions to the neck, and multiple reddened areas to the back. An anatomical diagram of Plaintiff's injuries included in the records also documents injury to the left side of Plaintiff's back. *See* Part B Addendum.

12. Defendants deny that any force was used against Plaintiff between the time he was restrained by Marra and the time he was medically evaluated in the prison's infirmary. *See* Incident Memoranda at 2, 4-7.

13. From the infirmary, Plaintiff was transported by ambulance to Gouverneur Hospital, where he underwent x-rays and other tests and was diagnosed with, among other injuries, four fractured ribs on his left side. *See* Gouverneur Records.

14. Before his October 28, 2020 interaction with Marra, Plaintiff never sustained a fractured rib nor had any significant pain in the area of his ribs. *See* McCallion Decl. ¶ 7.

13

15. Marra opined at his deposition that Plaintiff's fractured ribs were caused by Marra slamming Plaintiff to the ground. *See* Mara Dep. at 32-34, 71.

16. Marra's supervisor, Defendant Sgt. Joseph Coffey, was a former state finalist wrestler. *See* Coffey Dep. at 78-80, 90

17. Coffey similarly opined at his deposition that Plaintiff's fractured ribs could have been caused by the body slam executed by Marra. *See id*.

18. On November 5, 2020, Plaintiff was photographed and interviewed regarding the events of October 28. *See* McCallion Decl. ¶ 8.

19. Correction Officers Craig Weidner and Kreg Jackson were both present when Plaintiff was being photographed and when he was being interviewed. *See id*.

20. After the photographs and interview, Plaintiff was beaten by Weidner and Jackson, causing him to sustain yet additional injuries, including a perforated eardrum. *See id*.

Dated: New York, New York
       March 27, 2024

> By s/ Edward Sivin
>    Edward Sivin
>    Bar Roll Number: 514765
>    Sivin, Miller & Roche LLP
>    Attorneys for Plaintiff
>    20 Vesey Street, Suite 1400
>    New York, NY 10007
>    Telephone: (212) 349-0300
>    E-mail: esivin@sivinandmiller.com